TERRI KEYSER-COOPER, Nevada Bar #3984
LAW OFFICE OF TERRI KEYSER-COOPER
2395 Viejo Place
Lake Havasu City, AZ 86406
775-337-0323
keysercooper@lawyer.com
*Attorney for Plaintiff Christopher Pruett*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

CHRISTOPHER PRUETT,                          Case No.

       Plaintiff,                          **COMPLAINT**

    vs.                                       **(Jury Demand)**

UNIFI AVIATION, L.L.C.

       Defendant.
_____/

## JURISDICTION AND VENUE

1.  This Court has jurisdiction of this action pursuant to 28 U.S.C. Sections 1331, 1343, 2201; Title I of the Americans With Disabilities Act ("ADA") 42 U.S.C. §§12101-12214; the ADA Amendments Act of 2008 (ADAAA); and 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e et seq.; and 28 U.S.C. Sections 1331, 1343, 2201.

2.  Venue is proper in the Northern District of Nevada pursuant to 28 U.S.C. Section 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is within this judicial district.

## PARTIES

1.  Plaintiff CHRISTOPHER PRUETT ("Pruett" or "Plaintiff") is a citizen of the United

States residing in Reno, Nevada, a former employee of Unifi Aviation, L.L.C. Plaintiff has filed a charge of discrimination with the Nevada Equal Rights Commission, received his right to sue letter, and timely files his Complaint.

2.      Defendant is UNIFI AVIATION, ("Unifi" or "Defendant"), an aviation support services company, formerly known as Delta Global Services ("DGS").

3.      Plaintiff alleges that Unifi and/or its agents, employees, and servants performed, participated in, aided and/or abetted in some manner the acts averred herein, which proximately caused the damage averred below and is liable to Plaintiff for the damages and other relief sought herein. Pruett further alleges that ESP ratified, approved, delegated, and authorized all actions of its agents, employees, and servants.

## FACTUAL ALLEGATIONS

### ADHD and Autism Disabilities

4.      Plaintiff Pruett was diagnosed at age six with Attention Deficient Hyperactivity Disorder ("ADHD") and autism. Both ADHD and autism are recognized as disabilities and learning disorders under the Americans with Disabilities Act ("ADA"). Throughout his schooling he attended special education classes.[1] His disability was diagnosed as a learning disorder which affected major activities such as thinking. Pruett was in special education from the first grade until his sophomore year of high school. Until the age of ten Pruett had difficulty with balance, sensory perceptions, and touch. From the age of five until the age of ten, Pruett received treatment for these issues from the Easter Seals Foundation. Pruett's disability affects the major life activity of learning. Pruett's disability affects his ability to process new information—Pruett is and at all relevant times was, a very intelligent individual;

---

[1] Pruett's symptoms included hyperactivity, inattentiveness, difficulty with concentrating, focusing, following instructions, and tolerating changes in routine. Pruett had difficulty with spelling and grammar and mild dyslexia, but excelled in science, history and woodshop.

he simply learns information in ways different from the way other people without his disability learn information.

5.      Pruett's disability was treated with a variety of medications. The medications caused severe migraine headaches. At age 33, he was informed he would suffer from his disability for the rest of his life. Autism is considered a lifelong disorder with no known cure.

6.      ADHD is believed to be an inherited gene-related disorder causing an imbalance in the level of neurotransmitters in the brain. Autism is a complex developmental condition involving persistent challenges with social communication and repetitive behavior.

7.      Pruett is a quick learner, but requires structure and written rules to process new information. When presented with clear written procedures, Pruett is able to understand and follow.

**<u>Work History</u>**

8.      Pruett, 18, began working for DGS in Las Vegas in 2006 as a ramp agent. He was quickly promoted to a ramp lead position.  He worked for DGS until 2008 when he left to pursue other interests.

9.      In 2018, while in Tucson, Arizona, Pruett found a job listing for a DGS ramp agent. Pruett telephoned his former DGS manager, Jeremy, to inquire as to whether he was eligible for re-hire for DGS. Pruett telephoned Jeremy, his former ramp manager, in Las Vegas to ask if he was still eligible for rehire. Jeremy told Pruett he eligible for rehire, but the company would also be "lucky to have him." Pruett was hired the next day at the DGS Tucson station working as a ramp agent. Pruett was told he would be hired as a supervisor when a leadership position became available.

10.     In 2018 Pruett informed the Tucson station manager, Jason, he would like to transfer to the Reno, Nevada DGS station. Jason asked Pruett if he would be interested in a "supervisor position" in Reno. Pruett was interested. In 2018 Pruett flew to Reno to interview with DGS station manager

Tammy Mack and DGS regional manager Colin Herrington. Pruett was offered the job as a shift supervisor at the DGS Reno location.[2] Within two weeks, Pruett moved to Reno to begin work as a DGS shift supervisor.

### Pruett Becomes A DGS Shift Supervisor

11.    In 2018, Pruett was DGS's only shift supervisor. DGS operated four shifts, two morning shifts and two evening shifts. Pruett was responsible for supervising all shifts, receiving calls at home and throughout the night, responding to problems that arose on every shift—in essence Pruett was on call all the time, 24/7. Pruett worked closely with DGS station manager Tammy Mack, who delegated much of her responsibilities to Pruett—including hiring and firing, payroll, and a myriad of other responsibilities. Pruett ran a tight ship and was popular with employees. His goal was to make all employees succeed, to accomplish that goal he made himself available day and night to respond to aircraft problems and employee concerns. Pruett received praise from his station manager, Tammy Mack, and from regional manager Colin Herrington for his work performance and was led to believe he considered by management to be a competent, capable, and valuable employee. Mr. Herrington told Pruett repeatedly that he was doing a "fantastic job" and he does "great work." Ms. Mack continually said she "couldn't do her job without me."

### Pruett Becomes An Acting DGS Station Manager

12.    In January, 2019, Pruett was notified by DGS regional managers Eric Shockley and Colin Herrington, that Tammy Mack would be terminated and he (Pruett) would be "running the Reno DGS station" until a new station manager was hired. Both Mr. Shockley and Mr. Herrington were adamant that Pruett that he was the only DGS employee capable of assuming the role of acting station manager position and was required to accept it. Mr. Shockley said, "Keep doing what you are doing, you're doing a great job."

---

[2] A shift supervisor, working under the station manager, is responsible for ensuring flights go out on time, employees are where they are supposed to be, employees understand their job assignments, all procedures are properly followed, and the station manager is kept informed of all issues.

13.     Overnight Pruett became responsible for payroll issues, scheduling, hiring, discipline, equipment, and regular weekly calls with regional managers. Pruett was also required to interact with client airlines. Pruett served as acting station manager for approximately **four months**[3] until April of 2019 when Kayla Pruitt was hired as station manager. Pruett was commended by DGS management for stepping into the new position, and complimented on the job he was doing.

14.     On or about October, 2019, Ms. Pruitt was replaced as station manager by Matthew Denn. Pruett knew Mr. Denn when the two had worked together as ramp agents. Pruett had trained Mr. Dan. But Mr. Dan left in 2020 and with his departure, Pruett was again assigned to "acting station manager." Pruett remained as acting station manager for approximately **three months** until DGS hired Joshua Magana to become the Reno station manager. Pruett was again praised for the job he had done by the regional manager "Dillion" and complimented on how smoothly the operation had gone under his leadership.

### Pruett Becomes Performance Manager

15.     In fall 2021, Unifi management urged Pruett to apply for the newly created position of "performance manager." [4] Christina Flowers, a former station manager in Colorado Springs, Colorado and Crystal Seaman Flynn, a regional manager in San Jose, California both spoke individually to Pruett, requesting that he take the position of performance manager. Both Ms. Flowers and Ms. Flynn had worked well with Pruett; both had knowledge of his skills and performance. Both told Pruett he was

---

[3] Pruett was promised additional compensation for his new responsibilities, but DGS failed to provide the additional compensation.

[4] A performance manager is a position directly below the station manager. He is responsible for many tasks, including the day-to-day operation of the facility: making sure all employees are present and in their designated work areas, trained, competent, and doing their assigned tasks. He hires, fires, and disciplines. He ensures all supplies are available, including office supplies, ramp supplies, and employee uniforms. He confirms that employees properly clock in and out, frequently checking the time clock. He makes sure employee needs are met, their benefits are in place, they receive proper time off, their uniforms are appropriate, and required training is supplied. He handles employee disputes, working to ensure employees relate well with each other and disputes are promptly resolved.. He works closely with the shift supervisors.

5

"the only one in Reno that knows the ins and outs of the station and the only one that everyone looks up to." Ms. Flowers told Pruett he was the most qualified employee to take the new position because he was well respected by his crew and knew the operation "like the back of his hand." Pruett liked his job as shift supervisor, but was persuaded by the two management officials to apply. On or about late August 2021, Pruett interviewed for the position of performance manager and was selected.

**Pruett Informs Management Of His Disability**

16.     Pruett's disability is not readily apparent. His ADHD and autism are learning disabilities, meaning that Pruett processes new information differently than other people, relying on written communication and writings. Once Pruett learns something, he does not forget it. Pruett informed Mr. Denn of his learning disability when the two worked together. He also told Crystal Flynn when they worked together. Ms. Flynn commented to Pruett that he "does a great job" despite his disability. Pruett informed Christina Flowers of his disability when she substituted at the Reno station; she was sympathetic to Pruett because she had for years been a special education teacher. When Mr. Magana was hired, Pruett also informed him of his disability.

17.     Pruett thought it especially important that Mr. Magana be aware of his disability because Pruett was now in a new position with heightened responsibilities. Pruett wanted to be sure he did everything "just right" and wanted to succeed. Even though Pruett had worked at the Reno station longer than any other employee, knew his job, and understood the rules and regulations, he knew he would face challenges with his **new tasks**. Pruett asked Mr. Magana to put his assignments in writing. Pruett explained to Mr. Magana that he learned best by visually taking in new material. It had been difficult and stressful for Pruett when thrust into the role of acting station manager without directions. Pruett explained to Magana that his need for written clarity was a direct result of this disability and based on his ADHD and autism.

18.     Mr. Magana refused to honor Pruett's request for accommodation. He would not put new and different tasks in writing. Instead, Mr. Magana would tell Pruett "do whatever I would do." He would tell Pruett, "You are an extension of me, just do what you think I would do." This created an impossibly stressful situation for Pruett; Mr. Magana's refusal to put directions in writing made his directions vague, ambiguous, and unclear. Pruett was suddenly doing new things and having new responsibilities, but Mr. Magana would not put anything in writing—therefore the directions were unclear and ambiguous.

19.     Mr. Magana was frequently absent, forcing Pruett to become acting station manager in his absence. On one occasion, Mr. Magana went to Jackson Hole, Wyoming for over a month without giving Pruett any instructions other than on how to handle payroll. Mr. Magana told Pruett, "You are my extension, just do everything I would do." Pruett, stressed, nervous, and worried, frequently called Mr. Magana wanting clarity on various issues, but Mr. Magana would not answer his phone. Instead, Pruett telephoned regional managers asking questions that should have been answered by Mr. Magana.

20.     Mr. Magana, even when present, delegated most of his duties to Pruett. Mr. Magana often sat in his office, watching television. He relied exclusively on Pruett to handle the day-to-day functions of the job of station manager.

21.     Mr. Magana's refusal to accommodate Pruett's disability, to acknowledge his need for accommodation, or to engage in the required interactive process to learn Pruett's needs, his disability, the reasons for his needs, created for Pruett great emotional distress. Pruett telephoned and texted Christina Flowers about the deteriorating situation with Mr. Magana. Ms. Flowers appeared sympathetic, praising Pruett in text messages and offering him Unifi supervisory positions in Phoenix, Tucson, or Denver. Ms. Flowers assured Pruett that his hard work with Unifi in running the Reno operation did not go "unnoticed" and urged him to "hang in there."

**Ridicule In The Workplace**

22.     Mr. Magana did not know what was required of him as a supervisor when a disabled employee requested an accommodation. Unifi's Employee Handbook states:

> The Company will make reasonable accommodations available to the known physical or mental limitations of qualified employees and applicants with disabilities under appliable law unless the accommodation would pose an undue hardship on the operation of the business or would constitute a direct threat to the health and safety of our employees.

> If, because of a physical or mental disability, you need an accommodation to enable you to perform the essential functions of your job, please notify your Supervisor or your Human Resources Manager so that, together, we can discuss your situation and how we can help.

23.     Pruett's request for his tasks to be written out clearly for him would not have caused either Mr. Magana or Unifi undue hardship. Unifi's policy recognized the need to engage in the interactive process, the question and answer session between the disabled employee and his employer.

24.     Mr. Magana understood Pruett had a disability because Pruett told him so. Mr. Magana knew it was a learning disability. Yet Mr. Magana had a mean vicious streak, inappropriate for the workplace. Instead of appreciating Pruett's years of experience and knowledge of the job, his popularity with employees, and his dedication to the job, Mr. Magana used Pruett's disability against him, undermining him with ridicule, making fun of him for being "stupid" even in front of Pruett's subordinate employees. Mr. Magana would say in front of others, "We have to dumb things down for Chris to understand." Or "We have to talk 'Chris talk' for Chris to be able to understand," ridiculing Pruett as a dolt, a retard, someone too stupid to understand plain English.

25.     Pruett was mortified at Mr. Magana's conduct. Pruett had much familiarity with ridicule for his disability and had worked hard to do everything exactly right. He did not want to be ridiculed and resented being ridiculed by Mr. Magana. The open, intentional, deliberate and unconcealed ridicule caused Pruett great emotional distress because Pruett did not know how to handle Magana's hostility.

When Magana mocked Pruett, he did not criticize Pruett's performance, did not discipline him, and did not find fault with anything specific Pruett had done; instead, he mocked Pruett as stupid. Pruett had suffered years of abuse in school, forced to attend special education and endure years of derision from other students. Pruett was subjectively offended; any reasonable person would be offended at the open ridicule of a disabled person on the basis of his or her disability.

26.     Mr. Magana's ridicule began about three months after his arrival at the Reno station, shortly after Pruett made it known to him he had a learning disability. At first Magana ridiculed Pruett only occasionally, once every few weeks, but it escalated, becoming more frequent in the summer of 2022. Eventually Mr. Magana was making fun of Pruett's speech two times per week.

27.     Pruett spoke to regional manager Christina Flowers about the ridicule on several occasions. Pruett told her Mr. Magana was talking to him as if he was an idiot, making fun of his speech, doing it in front of employees. Ms. Flowers flew to Reno, telling Pruett she would observe the interactions between him and Mr. Magana. She met with Mr. Magana and Pruett. She told Mr. Magana that his conduct was something she would expect out of a 12 year old, it was toxic behavior, and better relations needed to occur because neither Pruett nor Magana "were going anywhere." Ms. Flowers directed both Mr. Magana and Pruett to meet weekly. She insisted Mr. Magana provide the reasonable accommodation Pruett required: that instructions be issued in written form, in emails. She directed Mr. Magana to tell Pruett what he wanted done, but to always follow-up with written instructions.

28.     After Ms. Flowers left the Reno, Mr. Magana ignored everything she said. No weekly meetings occurred and the ridicule did not cease. Pruett telephoned Ms. Flowers repeatedly, telling her that Mr. Magana was continuing with the ridicule. Ms. Flowers was "busy" and unable to deal with the problem. Ms. Flowers, as a regional manager, had the authority and responsibility to discipline Mr. Magana but neglected to do so, even when she knew he was continuing with his unwelcome, unlawful,

hostile ridicule, thus allowing it to continue.

29.     Pruett also told Ms. Flynn about the ridicule he experienced from Mr. Magana. Pruett told her about the "stupid" comments, that people needed to "dumb things down for Chris to understand, that everyone had to speak "Chris speak" for Chris to understand, as well as  other things. Ms. Flynn acted as if this ridicule was nothing, unimportant, and Pruett needed to ignore it and get on with his job. Ms. Flynn, like Ms. Flowers, had the authority and the responsibility to take corrective action, to remedy the hostile work environment Pruett was in and did not, thus allowing the ridicule to continue.

30.     As a result of Mr. Magana's abuse, Pruett determined to work twice as hard and resolved to prove to Mr. Magana that he was not stupid. Pruett's distress over Mr. Magana's blatant public ridicule led to him "overthinking" everything he did, questioning himself, not wanting to make a mistake—this led to increased migraine headaches and substantial emotional distress.

**Express Jet Fails Audit**

31.     In January 2022, Unifi was informed that Express Jet had failed an F.A.A. audit. Pruett met with the auditor, took notes, and reported to Mr. Magana. Mr. Magana told Pruett he was worried about losing his job as he was responsible for the operation. Pruett endeavored to calm Mr. Magana, telling him they would work together as a team and would help him in any capacity he needed.

32.     After Pruett calmed Mr. Magana, the station manager turned on Pruett, blaming him for the failed audit and pledging to discipline him. Pruett telephoned Express Jet to discuss the failed audit and what was necessary to fix the issues. Pruett told Express Jet Vice President, Phillip, that he was to be disciplined for the failed audit. Phillip was upset, telling Pruett, "I don't know why you are getting a write-up for doing what we told you to do." Phillip telephoned Mr. Magana, telling him he could not discipline Pruett for the failed audit as Pruett had done exactly what Express Jet wanted him to do. Express Jet told Mr. Magana to withdraw Pruett's discipline. While Pruett was in Magana's office, with

other employees present, Mr. Magana assured both Pruett and Express Jet management that Pruett's discipline would be removed. And it was, Pruett continued to be discipline free.

### Pruett 's Deposition Prompt's Unifi Hostility

33.     On August 12, 2022, Pruett testified in a lawsuit initiated by an African-American Unifi employee, Hiram Johnson. Pruett did not volunteer to participate in the deposition; he did not want to participate. He was told by Mr. Magana that he was *required* to participate. Pruett was telephoned by a Unifi attorney, believed to be "Mr. Washington," and "prepped" for the deposition. Mr. Johnson's lawsuit was a failure to promote case. During this initial prepping, the lawyer indicated Pruett was a "key witness" and expressed frustration with Pruett who had nothing negative to say about Mr. Johnson. The lawyer's tone of voice changed as the "prepping" continued—growing critical of Pruett who made clear he would be honest about Mr. Johnson, who he respected and admired.

34.     Pruett testified exceedingly favorably about Mr. Johnson. Pruett testified that Johnson was a "**fantastic**" employee, someone he could "trust" and someone who was so good at his job he could even do Pruett's job.[5] Pruett was extremely positive about Mr. Johnson's work performance, testifying that Mr. Johnson had "a lot of wisdom" and when problems on the job occurred,  Mr. Johnson was generally the first to "make sense" of how to solve the issue. Pruett testified that he felt "very positively" about Mr. Johnson's work, that Johnson was "always there," and would have made "hands down" and by a "long shot" a far better candidate for the promotional opportunity than the white candidate, Aaron Sprinkle, selected.

35.     Pruett vigorously praised Mr. Johnson, stating unequivocally that he "depended" on him because he worked a substantial amount of overtime, was always willing to do what was requested, and was reliable. Pruett stated that if anyone at Unifi was ever going to be his boss, he hoped it would be Mr. Johnson. Pruett testified that at the time he applied for the performance manager position he had

---

[5] Pruett testified that while Mr. Johnson was an "agent in charge" he depended on Mr. Johnson because he was a senior agent and knew "everything."

discussed it with Mr. Johnson, acknowledging that he didn't get the job he hoped it would be Mr. Johnson. Pruett explained he had worked with Mr. Johnson nearly every day for two years and knew him to be professional.

36.     One of the issues in Mr. Johnson's lawsuit was that he was not given an interview. Unifi failed to inform him of when interviews would be conducted. On the day of the interviews, he had a morning one-hour dental appointment.  On his return, he was informed he had "missed" the interviews and would not be interviewed. Mr. Johnson protested that he had not been informed of the interviews and wanted an opportunity to interview. Pruett testified he would have rescheduled Mr. Johnson's interview.

37.     The totality of Pruett's deposition testimony was decidedly favorable to Mr. Johnson and adverse to Unifi. The day before his deposition Pruett received a quick call from Unifi's counsel, Ethan Thomas, explaining the basics of a deposition. Immediately after the deposition, Mr. Thomas called Pruett again, this time critical of Pruett's testimony, indicating he had talked too much, said too much, and failed to follow the instructions given to him on how to answer questions. He indicated Pruett needed to be precise. Pruett explained he was honest and understood that was what was required of him. Pruett felt Mr. Thomas was annoyed with him, critical of his deposition performance, warning him that he would need to behave differently if called to testify again. On the telephone with Mr. Thomas was a woman he believed and understood to be a  "Ms. Soco" a Unifi employee.

38.     It is believed and alleged that Mr. Thomas communicated to Unifi officials that Mr. Pruett's testimony was adverse to the company in the Johnson case. After Pruett testified, things quickly worsened for Pruett. Mr. Magana's ridicule and mockery of Pruett's intelligence became more frequent, rising to two or three times a week. Mr. Magana made clear he thought Pruett was "retarded" and spoke a separate language from others—insisting that people needed to speak "Pruett speak" in order to

understand Pruett. Magana was scornful, not teasing or funny, mocking Pruett by saying Pruett was "too dumb to understand how everyone else spoke." Mr. Magana seemed to particularly delight in ridiculing Pruett with Pruett's subordinate employees in the room/

39.     The work environment became increasingly hostile, severe, and pervasive, Pruett's deposition testimony favorable to Mr. Johnson; the toxic atmosphere making it difficult for Pruett to do his job without extreme stress.

**Express Jet Files For Bankruptcy**

40.     On or about August 22, 2022, Express Jett filed for bankruptcy, closing its operation at the Reno airport.  Members of Express Jet management officials telephoned Pruett to thank him for of his hard work and dedication to their airline. Three members of Express Jet management, Lisa, Matt, and Phillip, personally telephoned Pruett to express their gratitude for all he had done. The Express Jet team had interacted with Pruett weekly and was familiar with his dedication to the company. Vice President Lisa, Manager Matt, and Manager Phillip praised Pruett for doing things the way they had wanted them done  and for being available to the company at all hours.

41.     Pruett was concerned about his job after the closing of Express Jet. Pruett oversaw the Express Jet contract as well as the Delta Airlines contract. Pruett spoke to Mr. Magana and Regional Manager Christina Flowers. Both  assured him his "job was safe" and he would need to concentrate on the Delta Airlines contract which was far larger than the Express Jet contract.

**Ridicule And Disrespect From New Regional Manager**

42.     As the month of August drew to a close, Mr. Magana became even more openly hostile to Pruett. He would order Pruett to "take care of things" in a very specific way, then when Pruett did exactly what he was asked to do, Mr. Magana openly criticized him. Pruett would issue employee instructions and Magana would contravene Pruett's instructions.

43.     On or about early September, 2022, within weeks of Pruett's testimony in the Johnson case, Pruett had occasion to telephone D.R. Silkwood, Unifi's new regional manager. It was the first ever conversation Pruett had with Mr. Silkwood. Mr. Magana was on vacation; Pruett was in charge of the Unifi operation and an employee was acting out—coming to work smelling of marijuana, and Pruett wanted instructions from the new regional manager on how to handle the employee.

44.     Pruett was friendly and respectful to Mr. Silkwood. He wanted Mr. Silkwood's advice on how to handle the errant employee only because Mr. Magana was out of the office. Mr. Silkwood was immediately hostile, disrespectful, and ill-mannered to Pruett, announcing out-of-the-blue that the "Reno station was failing" and it was Pruett's fault. Pruett was shocked at Silkwood's attitude—Pruett had never before been criticized for any aspect of his job performance, had never met or talked to Mr. Silkwood, and here Mr. Silkwood was speaking to him as if he were an imbecile. Mr. Silkwood did not make any specific allegations of misconduct by Pruett, just the general allegation that Pruett was a big problem for the company.

45.     Pruett defended himself. Pruett told Mr. Silkwood he was doing his best, working round the clock, responsible for all actions, and had never before been criticized for his work performance. Pruett did not know what to make of Mr. Silkwood's surprising attack, it was unsettling and stressful, but he resolved he would do his best to be properly responsive to Mr. Silkwood.

46.     It is believed and alleged that Mr. Silkwood had a good working relationship with Mr. Magana, the two were friendly, and Mr. Magana spoke to Mr. Silkwood about Pruett in a disrespectful manner, blaming anything and everything on Pruett.

47.     It is believed and alleged that Mr. Magana ridiculed Pruett to Mr. Silkwood.

48.     It is believed and alleged that both Mr. Magana and Mr. Silkwood were aware that Pruett had testified in the Johnson case in a manner decidedly favorable to Mr. Johnson.

49.     It is believed and alleged that Mr. Silkwood, based on what Mr. Magana told him, blamed everything and anything on Pruett. Without ever talking to Pruett, meeting Pruett, or discussing anything with Pruett, Mr. Silkwood determined Pruett to be an incompetent, stupid, worthless employee.

50.     One week later, Mr. Silkwood initiated a group telephone call between Mr. Magana, Pruett, and himself. Silkwood dominated the conversation, blaming and criticizing Pruett with overt hostility. Mr. Silkwood did not accuse Pruett of specific instances of misconduct or wrongdoing, instead he would say: "Chris, what are we doing to ensure things are working?" And "I'm not buying your excuses." And "I'm not confident in your leadership abilities." Pruett did not know what Mr. Silkwood was talking about, what he wanted him to do differently, or what the specific problem was. All he knew was just like Mr. Magana, Mr. Silkwood was treating him like an imbecile. He had not received any specific instructions of what he needed to do. Pruett was the oldest and most experienced employee at Unifi, and knew everything that needed to be done, had been on top of the operation for years, but he was now being treated by Mr. Silkwood, as if he had just arrived on the job and didn't speak the language.

51.     On or about September 30, Pruett participated in another call with Mr. Silkwood and Mr. Magana. Mr. Silkwood again blamed Pruett for what he repeated was the disarray of the Reno Unifi station. Mr. Silkwood was disrespectful and hostile, refusing to respond to Pruett's questions, declining to outline what mistakes Pruett had made, and refusing to explain what Pruett had done wrong. Mr. Silkwood informed Pruett he would give Pruett a 60 day "letter of expectations" detailing precisely what he wanted Pruett to do to improve the Reno station. Silkwood told Pruett they would talk again in 60 days to go over Pruett's performance issues. Pruett did not know what to make of this situation. He had never been disciplined and had not been told of any specific issues of wrongdoing. Pruett was beside himself with worry and distress.

**Pruett Writes Letter Requesting Accommodation**

52.     On September 30, 2022, following the telephonic conversation earlier that day, Pruett emailed Mr. Silkwood, copying Mr. Magana. Pruett explained he had ADHD and autism and thrived on "structure and rules." Pruett explained that when given instructions, he follows them "quite literally." Pruett stated, "I'm all about following rules." Pruett explained that the way the station has been going in the past few months had been a "free for all" and he had constantly questioned Mr. Magana about the way he wanted things done. It appeared to Pruett that rules were not being followed and employees were given instructions by him only to have his instructions immediately countermanded by Mr. Magana.

53.     Pruett explained that he was asked by the company to apply for the performance manager position and had turned his disability into an asset. Pruett explained that he was proud of the work he had done at Unifi and wanted to succeed at the company. "I am very good at structuring out my day." Pruett explained he had always done well with Delta Airlines because they imposed a strict structure and he was easily able to follow the structure. Pruett ended his email to Silkwood by stating, "I have five kids and a non-working wife so this job is literally everything to me and I don't take possibly losing it lightly." Pruett requested to help in the plan to improve his performance, in whatever manner that would require. Pruett wanted to work and to succeed at his job.

**Silkwood Responds To Pruett's Letter Requesting Accommodation**

54.     Following receipt of Pruett's email, Mr. Silkwood responded to Pruett by thanking him for bringing the issue of his disability to his attention. Silkwood stated, "I am going to reach out to our HR team and determine what would be the proper steps to take to ensure we address the concerns. You should have a response from myself, or someone from our HR team within the next couple of business days."

**Termination**

55.     On or about October 3, 2022, Pruett was informed that Mr. Silkwood requested a third meeting to go over Pruett's "letter of expectations" detailing the plan for having Pruett succeed at Unifi. The letter of expectations was to provide specifics on what Pruett's necessary improvements. The meeting would take place via skype at 6:00 pm on October 5, 2022.

56.     On October 5, 2022, when the skype call took place, Mr. Silkwood was present along with Mr. Magana and Laura Moreno of Human Resources. Mr. Silkwood immediately announced there would be no letter of expectations: Pruett would be fired. Gone was the pretense of wanting Pruett to succeed. Gone was any reference to accommodating Pruett with specific instructions, an interactive process on Pruett's disability, or a discussion with Pruett on a reasonable accommodation for his disability. Mr. Silkwood said Pruett had been hired as a performance manager for the Express Jet contract, Express Jet had ceased operation, therefore Unifi could no long afford to pay Pruett's salary. Mr. Silkwood was clear: Pruett was terminated solely because his position was eliminated due to Express Jet's withdrawal from the Reno airport.

57.     Pruett explained he had also been working as a performance manager for Delta Airlines as well as Express Jet . Express Jet had only four to five flights a day while Delta had up to fifteen flights a day. Pruett announced the company was currently advertising for two performance managers, why should he be fired when the company was advertising for two performance managers. Mr. Silkwood explained to Pruett that a performance manager was no longer needed.

58.     Mr. Silkwood told Pruett he was "doing him a favor." He would make Pruett eligible for re-hire in six months to any available Unifi supervisor position. Pruett said, "You are not doing me a favor, you are firing me." Pruett said the rules required that he be given a "write-up" and a "letter of expectation" before termination and he had received neither. Laura Moreno jumped in to explain that Unifi had discretion to ignore those requirements if it so chose. Moreno said the separation was by

"mutual agreement" which Pruett quickly denied, "I don't agree to be fired."

59.     Pruett requested to be transferred into any available position, to keep his job as a performance manager in charge of the shift supervisors and the Delta contract but Silkwood insisted, he would be terminated. Mr. Silkwood said the position of performance manager would be eliminated, there would not be a performance manager at Unifi's Reno station.

60.     Pruett made clear he had requested a reasonable accommodation and instead was fired. Silkwood did not respond to Pruett's request for a reasonable accommodation, opting instead to fire him.

### A Severance Package Premised On Pruett's Agreement Not To Sue

61.     On or about late evening October 5, 2022, Pruett shell-shocked by the termination, received an email from Ms. Moreno. Ms. Moreno offered Pruett a "Severance and Release Agreement" with the benefit of four weeks of pay conditioned upon Pruett's *agreement not to sue Unifi*. She expressly stated Pruett was "being separated" from Unifi because of "position elimination," nothing else. There was no mention performance issues, no mention of discipline, no mention of any wrongdoing. Ms. Moreno thanked Pruett for his "service and commitment to Unifi" and wished him "the best in his future endeavors."

62.     The Severance and Release Agreement was five page single spaced document. It resembled a Settlement Agreement in a lawsuit. Pruett did not sign the Agreement and did not receive a severance package. Pruett went on unemployment and is now employed in another position, for another company, making almost half what he made at Unifi. He experienced great physical and emotional distress at the termination, suffering severe migraine headaches that continued for many weeks.

63.     Pruett position was not eliminated. A new performance manager was hired within days of Pruett's termination. Pruett was eligible for that position, asked for the position, wanted the position,

yet was denied the position because he was told his job was eliminated. Obviously his position was not eliminated as another individual was hired immediately into his position, doing exactly what Pruett had been doing, with the identical title of performance manager.

64.     After Pruett's termination, for a significant period of time, Unifi employees continued to call Pruett at his home with questions about how things should be done, which "codes" to use as part of their job and statements about how chaotic things were without him. In one instance, Pruett was informed that Magana had told an employee to call Pruett with direct questions.

65.     As a direct and proximate result of Defendant's actions and disregard for Pruett's rights to be free from retaliatory conduct for the exercise of protected activity, Pruett has suffered damages including lost backpay, front pay, lost benefits and bonuses, the indignity of retaliation based on the exercise of a protected right, great humiliation, and continuing physical and emotional distress, outrage, severe anxiety about his future, damage to his reputation, disruption of his personal life, and loss of enjoyment of the ordinary pleasures of everyday life.

66.     As a direct and proximate result of Defendant's actions and disregard for Pruett's rights under the ADA and failure to accommodate his disability, Pruett has suffered damages including lost backpay, front pay, lost benefits and bonuses, the indignity of retaliation based on the exercise of a protected right, great humiliation, and continuing physical and emotional distress, outrage, severe anxiety about his future, damage to his reputation, disruption of his personal life, and loss of enjoyment of the ordinary pleasures of everyday life.

67.     As a direct and proximate result of Defendant's actions and disregard for Pruett's rights to be free from ridicule and an overtly hostile work environment based on his disability, Pruett has suffered damages including lost backpay, front pay, lost benefits and bonuses, the indignity of retaliation based on the exercise of a protected right, great humiliation, and continuing physical and

emotional distress, outrage, severe anxiety about his future, damage to his reputation, disruption of his personal life, and loss of enjoyment of the ordinary pleasures of everyday life.

**FIRST CAUSE OF ACTION**

**Retaliation-Violation of Title VII**

68.     Pruett realleges and incorporates by reference herein the allegations above contained.

69.     42 U.S.C. § 20002-3(a) makes it an unlawful employment practice for an employer to discriminate against any of his employee because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter. Pruett relies on the participation clause. The words of the statute are unambiguous; the anti-retaliation provision is straightforward and expansively written. Congress chose the language "testified" and "participated in any manner" to express its intent about the activity to be protected against retaliation. The word "testified" is not preceded or followed by any restrictive language that limits its reach. As to "participated in any manner," the adjective "any" is not ambiguous; it has a well-established meaning.

70.     By giving deposition testimony and commanded by his employer to provide the testimony, Pruett testified in Mr. Johnson's Title VII lawsuit. Pruett was asked questions about Johnson and gave truthful answers under oath. Pruett also "participated" in Johnson's Title VII lawsuit. One who has participated as a reluctant deponent has "participated." This participation is protected activity.

71.     The elements of a retaliation claim are, (1) the employee engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. Pruett participated in protected activity when he testified as a deponent in a Title VII case, he suffered an adverse employment action, termination, and a causal relationship existed between the protected activity and the termination. Causation may be determined by the temporal proximity of the termination to the protected activity—here, approximately 50 days.

72.     The causation element is further added by the telephone call from Mr. Thomas to Mr. Pruett, expressing annoyance at Pruett for his specific testimony. Mr. Thomas made clear he was unhappy with the way  Mr. Pruett had testified, telephoning him within hours of his testimony to admonish him for the way he had testified. It is highly likely that Mr. Thomas communicated his displeasure with Mr. Pruett's testimony to his client, Unifi and the company was unhappy with Pruett because his testimony greatly aided the Johnson lawsuit and harmed Unifi's position.

73.     Defendant has stated a false and pretextual reason for its termination of Pruett, one that is illogical, inconsistent, and untrue. Defendant's purported legitimate non-retaliatory reason for Mr. Pruett's termination, that his position was eliminated, is a pretext for the true reason, retaliation, and not credible. Defendant claimed Pruett was terminated because his position, performance manager, was eliminated but at the same time Defendant was advertising for a new performance manager and hired one within days of Pruett's termination. It is believed and alleged that a new employee, never before employed by Unifi, with far less experience, was hired to be Defendant's new performance manager within days of Pruett's termination. There was no legitimate reason that Pruett could not remain in the position of performance manager because Defendant needed a performance manager and hired a performance manager immediately after terminating Pruett.

74.     Pruett's participation in the deposition of Hiram Johnson, and the testimony he provided was both the motivating factor and the but for cause of his termination.

75.     As a direct and proximate result of the aforedescribed unlawful and malicious conduct by Defendant, plaintiff suffered economic loss, grievous bodily harm, physical and emotional distress in violation of the Title VII anti-retaliation clause.

76.     As a direct and proximate result of Defendant's actions and disregard for Pruett's rights to be free from retaliation for protected activity, Pruett has suffered damages including backpay, front

pay, lost benefits and bonuses, the indignity of retaliation based on the exercise of a protected right, great humiliation, and continuing physical and emotional distress, outrage, severe anxiety about his future, damage to his reputation, disruption of his personal life, and loss of enjoyment of the ordinary pleasures of everyday life.

77.     As a direction and proximate result of Defendant's actions evincing intentional retaliation with malice or reckless indifference to Plaintiff's federally protected rights as an aggrieved individual, Plaintiff is entitled to a finding of punitive damages.

**SECOND CAUSE OF ACTION**

**<u>Failure To Accommodate- Violation of the ADA</u>**

78.     Pruett realleges and incorporates by reference herein the allegations above contained.

79.     The record is undisputed that all station managers and regional managers that Pruett regularly dealt with were aware of his disability. Pruett expressly told station managers Matthew Denn and Joshua Magana and higher management officials Crystal Flynn, Christina Flowers, and D.R. Silkwood about his disability. On September 30, 2022, Pruett emailed D.R. Silkwood about his disability and his need for a reasonable accommodation. D.R. Silkwood acknowledged receipt of Pruett's email and promised to "reach out to HR" yet instead of reaching out to find ways to accommodate Pruett's disability, he terminated him within five days.

80.     An awareness of Pruett's disability triggered Defendant's duty to engage in the interactive process. At no time did Defendant discuss with Pruett what he needed to accommodate his disability, why he needed the accommodation, what the accommodation would entail. Defendant did not attempt in any way to engage in the required interactive process.

81.     To establish that Defendant discriminated against Pruett in violation of the ADA by failing to provide a reasonable accommodation, Pruett must prove: (1) that he is a qualified individual; (2) that the Defendant received adequate notice of his disability and desire for a

reasonable accommodation; and (3) a reasonable accommodation was available that would have enabled him to perform the essential functions of the job. Pruett has established these requirements. His disability is accepted as a known disability under the ADA. He was qualified to do his job because he did it for a substantial time, receiving bonuses, promotions, and not a single disciplinary action—nor was he ever informed of any misconduct. Pruett ran the entire Reno operation off and on, for years, without only praise from regional station managers. A reasonable accommodation was available; if Mr. Magana or Mr. Silkwood wanted the operation handled differently, all they needed to do was put their requirements in writing so Pruett could read and digest the instructions.

82. The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a "qualified individual," the employer has adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business. 42 U.S.C. § 12112(b)(5)(A). The statute itself places on the employer the burden to demonstrate an undue hardship.

83. Causation in a reasonable accommodation claim is satisfied if the plaintiff demonstrates that, once aware of the disability and need for accommodation, the Defendant fails to make a reasonable accommodation. No evidence of discriminatory intent is necessary.

84. Accommodation means that the employer must be willing to consider making changes in its ordinary work rules, facilities, terms and conditions in order to enable a disabled individual to work. Here, Mr. Magana refused to put instructions in writing, refusing to detail in writing exactly what he wanted Pruett to do, and instead insisting Pruett should "do what I do" while knowing that Pruett wanted and required clear instructions in written form.

85. Pruett was a qualified individual with a recognized disability, he had been performing in his job for years, he had not been disciplined, or given notice of specific misconduct.

Defendant had adequate notice of his disability. Pruett's request for accommodation was reasonable and would not have inflicted upon Defendant an undue hardship on its business.

86.     Mr. Silkwood's termination of Pruett was based on Pruett's request for a reasonable accommodation. It was the motivating factor of the termination and the but for cause of the termination. Mr. Silkwood ignored Pruett's written request for accommodation; his "reaching out to HR" was just hot air, meaningless drivel, as he made no attempt whatsoever to meaningfully engage with Pruett on his need for accommodation and instead fired him.

87.     Unifi has a policy on reasonable accommodation and ignored its policy. Before the termination, Mr. Silkwood indicated he would provide Pruett in days with "a letter of expectations" indicating how Pruett could improve, yet after Pruett reached out to him, explaining his disability and his need for accommodation, the letter of expectations was not issued and Pruett was fired.

88.     As a direct and proximate result of the aforedescribed unlawful and malicious conduct by Defendant, plaintiff suffered economic loss, grievous bodily harm, physical and emotional distress in violation of the ADA.

89.     As a direct and proximate result of Defendant's actions and disregard for Pruett's rights as a disabled person to be accommodated in the workplace, Pruett has suffered damages including lost backpay, front pay, lost benefits and bonuses, great humiliation, and continuing physical and emotional distress, outrage, severe anxiety about his future, damage to his reputation, disruption of his personal life, and loss of enjoyment of the ordinary pleasures of everyday life.

90.     As a direction and proximate result of Defendant's actions evincing failure to accommodate with malice or reckless indifference to Plaintiff's federally protected rights as an aggrieved individual, Plaintiff is entitled to a finding of punitive damages.

**THIRD CAUSE OF ACTION**

**Hostile Work Environment-Violation of the ADA**

91.     Pruett realleges and incorporates by reference herein the allegations above contained.

92.     Hostile work environment claims are cognizable under the ADA. Under the ADA, a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to …terms, conditions and privileges of employment." 42 U.S.C. §1211(a). When Congress included the phrase 'terms, conditions, and privileges of employment' in the ADA, it was using a legal term of art that prohibited a broad range of employment practices, including workplace harassment. Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—it follows that disabled Americans should be able to assert hostile work environment claims under the ADA, as can those protected by Title VII.

93.     To prevail on a hostile work environment claim, Pruett must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer.  Pruett must demonstrate a series of incidents sufficiently continuous and concerted to have altered the conditions of his working environment.

94.     Magana openly, frequently, intentionally, and pervasively ridiculed Pruett based on his disability.

95.     Pruett alleges the continuous and pervasive references to his stupidity, that employees needed to "speak Chris speak" to have Pruett understand them, and employees needed to "dumb down whatever they said so that [stupid Pruett] could understand them" was subjectively offensive to him and would be objectively offensive to any similarly situated disabled person. Mr. Magana's intentionally made comments were not workplace teasing or jokes; he mocked the manifestations of Pruett's disability, his learning disability. The ridicule Mr. Magana inflicted went

to the core of the humiliation and shame Pruett had suffered all of his life. Pruett had been mocked as a child for his disability and suffered humiliation, shame and embarrassment.  He felt degraded that his disability was the subject of laughter and reasonably felt there was nothing funny about teasing a disabled person based on his disability. The offensive ridicule went on for many months, becoming more frequent after Pruett testified in the Johnson case, occurring twice or more often in a given week.

96.  Mr. Magana was Defendant's highest ranking official at the Reno Unifi station. Mr. Magana was someone within Defendant's organization empowered to take tangible employment actions such as hiring, firing, reassigning with significantly different responsibilities, or the changing of benefits.

97.  The affirmative defense will not apply because while Defendant had an anti-harassment policy, it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring. Unable to get Mr. Magana to cease his offensive conduct, Pruett spoke to Mr. Magana's boss, regional manager, Christine Flowers, about the ridicule and abuse. Pruett spoke to Ms. Flowers and Ms. Flynn about Mr. Magana's conduct, how offensive it was, how embarrassing to be ridiculed in front of other employees, how often it occurred and how it interfered with his ability to do his job.

98.  Ms. Flowers appeared sympathetic to Pruett. Ms. Flowers told Pruett definitively, she would "fix" the problem but ultimately did nothing—allowing the ridicule to continue. She spoke to Mr. Magana about the ridicule but did not discipline him or inflict any punishment on him sufficient to produce corrective action. Ms. Flowers had the ability and the authority to order Mr. Magana to stop the harassment, to discipline Mr. Magana, and to make clear to Mr. Magana that ridicule of a disabled person based on his disability was unacceptable. Ms. Flowers was as bad as

Mr. Magana because she knew how the problem affected Pruett, she assured Pruett she would "fix" the problem, and yet she did not and the ridicule continued. Ms. Flowers knew the harsh, harmful effect of the abuse on Pruett and how it interfered with his ability to do his job, because Pruett told her.

99.     Ms. Flynn refused to entertain the notion that Mr. Magana's ridicule of Pruett based on his was unacceptable workplace conduct. Ms. Flynn told Pruett to ignore the conduct, it was unimportant. Ms. Flynn also had the ability and the authority to order Mr. Magana to stop the harassment, to discipline Mr. Magana, and to make clear to Mr. Magana that ridicule of a disabled person based on his disability was unacceptable.

100.    Mr. Magana's ridicule of Pruett's disability was the motivating factor and the but for cause of the physical and emotional distress Pruett experienced.

101.    As a direct and proximate result of the aforedescribed unlawful and malicious conduct by Defendant, plaintiff suffered grievous bodily harm and physical and emotional distress in violation of the ADA.

102.    As a direct and proximate result of Defendant's actions and disregard for Pruett's rights to work in an environment free from harassment, abuse, and ridicule based on his disability, Pruett has suffered damages including physical and emotional distress, great humiliation, outrage, severe anxiety, and loss of enjoyment of the ordinary pleasures of everyday life.

103.    As a direction and proximate result of Defendant's actions in creating, sustaining, and continuing a hostile work environment based on disability in violation of Pruett's federally protected rights, and failure and refusal to correct the environment when on notice of its corrosive effect on Pruett, Plaintiff is entitled to a finding of punitive damages.

## **RELIEF REQUESTED**

WHEREFORE, plaintiff prays for judgment against Defendants as follows:

27

(a)      For declaratory relief;

(b)      For equitable relief;

(c)      For compensatory damages from Defendants in an amount to be determined at trial relating to plaintiff's Title VII disparate treatment claim;

(d)      For economic damages including past, present and future lost earnings and related economic damages;

(e)      For punitive damages;

(f)      For attorneys' fees and costs incurred herein;

(g)      For leave to amend this complaint should the same become necessary;

(h)      For such other and further relief as this Court may deem appropriate.

Dated:  this 6th day of January, 2023

/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Christopher Pruett*